UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

BIJAN ALMASSIAN, Ph.D.

      Plaintiffs

VS.                                                    CIVIL ACTION NO.
                                                       3:03 CV 648 MRK

CAROLYN R. KAHN, Ph.D.

      Defendant                                 JUNE 1, 2004
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### *MEMORANDUM OF LAW IN SUPPORT*
### *OF MOTION FOR SUMMARY JUDGMENT*

## I.    PRELIMINARY STATEMENT:

The plaintiff, Bijan Almassian, Ph.D., brings a four-count complaint alleging that the defendant, Carolyn Kahn, Ph.D. ("Kahn"), discriminated against him because the plaintiff is of the Muslim faith. The plaintiff was president and chief operating officer ("COO") of AlexiPharma, Inc., a biotechnology company located in Connecticut. Kahn was the managing director for Bioscience, a division of Connecticut Innovations, which is a quasi-public state agency charged with growing Connecticut's entrepreneurial, technology economy by making venture and other investments in Connecticut-based companies. The plaintiff specifically alleges that after AlexiPharma applied for funding from Connecticut Innovations, Kahn made negative statements

about the plaintiff's qualifications which he claims forced him to resign from AlexiPharma. The plaintiff claims that the statements of Kahn which were an opinion of his business qualifications were motivated by hatred and bias against the plaintiff because of the plaintiff's Muslim faith. Plaintiff alleges in the first count that Kahn violated the equal protection clause of the Fourteenth Amendment to the United States Constitution in that her opinion of the plaintiff's business qualifications were based upon her dislike for the plaintiff's religion. In the second count, the plaintiff incorporates all of the allegations of the first count and claims that same supports a tortious interference with business expectations between the plaintiff and AlexiPharma, Inc. The third and fourth counts both incorporate all of the allegations of the first count, but claim that the same allegations constitute intentional infliction of emotional distress in the third count and negligent infliction of emotional distress in the fourth count. The defendant had previously moved to dismiss the third and fourth counts, however, the court denied that motion without prejudice, allowing the defendant to reassert those arguments in a motion for summary judgment.

The defendant now moves for summary judgment as to all counts of the complaint in that there are no genuine issues of fact and the defendant is entitled to judgment as a matter of law.

## II.    STATEMENT OF FACTS:

Carolyn Kahn, Ph.D. is managing director of Bioscience of Connecticut Innovations. Connecticut Innovations was created by the Connecticut legislature in 1989 with a charge of

growing Connecticut's entrepreneurial, technology economy making venture and other investments in Connecticut-based companies. See, Local Rule 56(A) Statement, paragraphs 1 and 2. Connecticut Innovations was formed to provide funding which is only intended to sustain young companies until they are able to attract lead institutional investors for a Series A round of financing. The Connecticut Bioseed Fund provides up to $500,000 to start up bioscience companies located in Connecticut. The eligibility requirements are that the bioscience company be headquartered in Connecticut, it must have or be developing proprietary technology; it must have on its team experienced scientific and business leaders; it must address a potentially significant business opportunity; and it must have an executive summary and at least a partial management team. See, Local Rule 56 statement and Affidavit of Kahn attached thereto.

Carolyn Kahn, Ph.D., as managing director of Bioscience, is charged with the responsibility of receiving applications seeking an investment and doing a due diligence search and investigation into all aspects of the company including, but not limited to, the proprietary technology, the business opportunity and most important, the qualifications of the management of that entity. See, Local Rule 56(A) Statement, paragraphs 1, 18-21. In that Connecticut Innovations is making an investment and hoping to receive a return on the initial investment into the start up companies, it is important that the companies who receive funding have experienced business leaders who can attract further financing including a lead institutional investor for a large Series A round of

financing. See, Local Rule 56(A) Statement, paragraphs 20-22.

AlexiPharma, Inc. is a Delaware corporation with headquarters in Connecticut. The founder of AlexiPharma was Alex Makriyannis who is associated with the University of Connecticut doing research in pain management and painkillers. AlexiPharma sought funding from Connecticut Innovations in June, 2002. A funding proposal was not made by Connecticut Innovations to AlexiPharma until January, 2003. See, Local Rule 56(A) Statement, paragraphs 4, 5, 32-33. The only employee of AlexiPharma during that period of time was Bijan Almassian. Mr. Almassian joined AlexiPharma on June 3, 2003. Plaintiff was hired at an annual salary of $200,000 plus bonus plan, stock options and was made president/COO of the company. However, the plaintiff was not given the position of chief executive officer because that was a decision that remained pending what the founders and directors of the company wanted and whether they saw Bijan Almassian as a CEO. If he was not made CEO he could stay on in the development side as a chief operating officer. See, Local Rule 56(A) Statement, paragraphs 6-9.

Bijan Almassian's prior employment was at Vion Pharmaceuticals out of New Haven, Connecticut as vice president of drug and corporate development. Mr. Almassian had been looking to leave Vion Pharmaceuticals for one year prior to June, 2002. In fact, Mr. Almassian, in addition to the offer made by AlexiPharma, received at least one other offer of employment from a pharmaceutical company. See, Local Rule 56(A) Statement, paragraphs 11, 12, 43. At or around

the same time that he received an offer of employment from AlexiPharma, Mr. Almassian received an offer of employment from Panacea Pharmaceuticals located out of Gaithersburg, Maryland. That offer was for Mr. Almassian to become the chief operating officer of that company with a salary of $200,000, stock options and a bonus plan. See, Local Rule 56(A) Statement, paragraph 12. Mr. Almassian has testified and admitted that he decided to take the position with AlexiPharma in that it was a new company and thought he would have a better opportunity to work himself into a higher level position such as a chief executive officer. Further, the business founder of AlexiPharma was someone who Bijan Almassian felt would be a good mentor and would be able to instruct him and assist him in obtaining experience in entrepreneurial activities and business negotiations. That individual was Harry Penner also of Connecticut. See, Local Rule 56(A) Statement, paragraphs 13-14.

Bijan Almassian was directly involved in the presentation to Connecticut Innovations, Inc. where AlexiPharma made a request for $500,000 in funding. The presentation was made in July, 2002 and in large part made by Bijan Almassian. Based upon that presentation the individuals at Connecticut Innovations on its investment team, including Carolyn Kahn, as well as outside investors, had doubts as to the business qualifications of the management team of AlexiPharma. See, Local Rule 56(A) Statement, paragraphs 15-16, 23-24. Carolyn Kahn, as well as others, continued to work with AlexiPharma to move it to a position where funding would be made

available. Changes to management occurred during the timeframe of July through December, 2002 which included the addition of an individual by the name of Davis Temple as a director, Richard Carter becoming head of research, Harry Penner agreeing to stay on as chief executive officer and Bijan Almassian would work on development and day-to-day operations of the company. See, Local Rule 56(A) Statement, paragraphs 30-31.

Prior to December 23, 2002 Carolyn Kahn, as well as others, expressed their opinion of upper management of AlexiPharma to the business founder Harry Penner. Carolyn Kahn advised Mr. Penner that it was her opinion that AlexiPharma did not have the correct people in management in order to achieve funding milestones which included raising $10,000,000 in a Series A investment. Her feeling was that AlexiPharma needed a president who was both a business man and a scientist who can make tough decisions relative to which compounds to pursue and what patents to keep alive. It was also her thought that the president/CEO would need to be someone who knows both the science and who can direct the scientific founder on which path to take and can also keep the business focus of growing the venture. Finally, this individual needs to have the negotiating skills to structure large deals especially related to additional funding milestones. It was Ms. Kahn's opinion that Bijan Almassian did not have those qualifications. However, she had the opinion that he had qualifications on the science and the development end and would be an asset to the company in that aspect. See, Local Rule 56(A) Statement, paragraphs 23-27, 42. Mr. Penner

shared these opinions with Bijan Almassian and Mr. Almassian took the opinions to be based upon the fact that he was Muslim and Ms. Kahn was Jewish. However, Mr. Almassian did not know for sure whether Carolyn Kahn was Jewish. He made the assumption simply based upon the spelling of her last name. See Local Rule 56(A) Statement, paragraphs 34, 40-41. Further, Ms. Kahn has stated by way of affidavit that she had no idea that Bijan Almassian was of Muslim religion and that neither one had discussions about religion and neither one shared their religious viewpoints with the other. See, Local Rule 56(A) Statement, paragraph 40 and affidavit of Kahn attached thereto.

Carolyn Kahn provided an update to the investment advisory committee at Connecticut Innovations on December 23, 2002 reflecting the changes to upper management as was discussed above. Pursuant to that update, Connecticut Innovations provided a funding package to AlexiPharma which included funding of $500,000 with certain conditions and Connecticut Innovations would have a certain interest in that company. That funding proposal was turned down by AlexiPharma. See, Local Rule 56(A) Statement, paragraphs 31-33.

Bijan Almassian claims that due to the statements by Carolyn Kahn he was forced to resign from AlexiPharma. However, he admits that both the CEO/business founder, Harry Penner, and the scientific founder, Alex Makriyannis, asked him not to resign and wanted him to stay to assist in growing the company. See, Local Rule 56(A) Statement, paragraphs 36-37.

Bijan Almassian also admits that Carolyn Kahn had a certain opinion as to what type of

person would be the appropriate CEO and candidly admits that he did not have that type of business style and that he and Kahn disagreed as to the appropriate business style. See, Local Rule 56(A) Statement, paragraph 42. As indicated it was Carolyn Kahn's job to perform an investigation and due diligence search of the company and give her opinion as to the business qualifications of the management team to determine whether the start up company had a chance of survival. Carolyn Kahn did not feel that Bijan Almassian had the business qualifications to push that company forward. However, she did think he had the scientific qualifications to assist with development of the particular medical compounds. See, Local Rule 56(A) Statement, paragraphs 19-20, 23, 26-27, 39. Bijan Almassian also admitted that he is not surprised that people do not have as high an opinion of his business qualifications as he does. However, for some reason he is claiming that Carolyn Kahn's opinion of his business qualifications was motivated by some religious bias. See, Local Rule 56(A) Statement, paragraphs 39, 44.

Bijan Almassian resigned his employment with AlexiPharma although he was requested by the two founders of the company not to do so. He then decided to take an offer from Panacea Pharmaceuticals which was the same offer he had received in May, 2002. Presently Bijan Almassian is chief operating officer at Panacea Pharmaceuticals located in Maryland with a starting salary of $200,000 with bonus and stock options. In addition, the company pays his apartment/home which he can live in while in Gaithersburg, Maryland. Further, Bijan Almassian

has not sought any medical treatment for any depression, anxiety or psychiatric problems and has not taken any medications for the same. See, Local Rule 56(A) Statement, paragraphs 38, 45.

## III.    STANDARD OF REVIEW:

Pursuant to Local Rule 56, "Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." Federal Rules of Civil Procedure 56. The non-moving party must do more than simply claim that there are issues of fact. Said party must go beyond the pleadings by an affidavit or evidentiary support designating the specific facts which establish a genuine issue of material fact on an element essential to the non-moving party's case. See, _Celetex Corporation vs. Catrett_, 477 U.S. 317, 322-24 (1986). The court's analysis is "[w]hether there is a need for a trial – whether, in other words, there are any genuine factual issues that promptly can be resolved only by a finder of fact because they may reasonably result in favor of either party." _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 250 (1986).

## IV.    ARGUMENT:

**A)    Plaintiff's Claim In The First Count Which Asserts Violation Of The Equal Protection Clause Of The Fourteenth Amendment Is Subject To A Motion For Summary Judgment In That The Plaintiff Cannot Demonstrate That His Rights Were Violated By The Action Of The Defendant**

"The Constitutional right to equal protection of the law is 'again essentially a direction that

all persons similarly situated be treated alike.'" *Katz v. Stannard Beach Association, et al*, 95 F.

Supp. 2d 90, 94- 95 (2000).

> "A protection claim which does not challenge the validity of a law, but challenges the select enforcement of that law is subject to a two-party test: (1) the plaintiff compared with others similarly situated, must have been selectively treated; and (2) the select treatment must have been motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." (Citations omitted.)

*Sanchez v. City of Hartford, et al*, 10 F. Supp. 2d 162, 169 (1998).

The plaintiff must allege and prove that: 1) compared with others similarly situated he was selectively treated and 2) such selective treatment was based upon impermissible considerations such as religion. See, *Crowley v. Courville*, 76, F. 3d 47, 52-53 (2d Cir. 1996). "Conclusory allegations of selective treatment are not sufficient … rather a plaintiff must allege [and demonstrate] purposeful and systematic discrimination by specifying instances in which the plaintiff was singled out for the unlawful oppression in contrast to others similarly situated." (Citations omitted.) *Sanchez v. City of Hartford*, supra.

First and foremost, the plaintiff has failed to allege any unfair treatment between him and any other individuals similarly situated. The plaintiff's allegations are merely that the defendant repeatedly stated to the board chairman and chief executive officer of AlexiPharma that AlexiPharma would only receive the funding if the plaintiff was removed from any connection with

AlexiPharma. The plaintiff further claims that the defendant specifically stated that you do not have the correct hands on board for the type of work that needs to be done to achieve funding milestones. However, the e-mail of Kahn states: "First of all, I really do think that AlexiPharma needs a president who is a businessman/scientist who can make tough decisions regarding what compounds to pursue, what patents to keep live, etc. Someone who both knows the science, can direct Alex, and also keep the business focus of growing this venture and last, but not least, has the negotiating skills to structure deals. As I have mentioned from the beginning this individual is not Bijan..." That particular quote comes from an e-mail of Carolyn Kahn and does indicate her opinion as to the business qualifications of Bijan Almassian. Ms. Kahn shared that opinion with the chief executive officer of the company seeking funding from Connecticut Innovations, Inc. The plaintiff makes the conclusory claim that those statements were based upon the plaintiff's religion as opposed to the analysis or general business opinion of Carolyn Kahn. The plaintiff claims in his complaint at paragraph 7 that he has precisely the qualifications and skills described by the defendant and that same is the plaintiff's opinion of himself. However, the plaintiff is also admitting that he would not be surprised if people did not have that same opinion. He also agrees that Carolyn Kahn's statement is an opinion of his business qualifications. However, he somehow elevates that the opinion is not due to her interactions and observations of the plaintiff, but only due to hatred or bias against him because of his religion. However, the plaintiff candidly admits that he

has only assumed that the plaintiff is of Jewish religion and the defendant has indicated that there were never any discussions about religion between the parties.

Further, the quotes by the defendant never mention that AlexiPharma would not receive the funding it was requesting from Connecticut Innovations, but merely she had the opinion that AlexiPharma may not achieve it funding milestones, i.e., a Series A funding. As is indicated in the plaintiff's offer of employment with AlexiPharma, he had certain funding milestones which included a Series A placement encompassing an investment of $10,000,000. It was the business opinion of Carolyn Kahn that said milestones would not be achieved if they were being directed by Bijan Almassian.

Further, despite the fact that the plaintiff makes an allegation that he has the qualifications and the skills necessary to push AlexiPharma forward, he has admitted in his deposition testimony that he took the position at AlexiPharma in order to receive mentoring in these areas from Harry Penner who is the business founder of that company. Further, it is important to point out that Bijan Almassian was not initially hired as the CEO, but only the president/COO of the company and he would not be made CEO until he was active in receiving and achieving the funding milestones as mentioned above.

The plaintiff cannot demonstrate that the equal protection clause of the Fourteenth Amendment was violated by the defendant by her statements. The defendant's position at

Connecticut Innovations was to analyze a company with a focus upon the management team to determine whether they could attract institutional investors in a Series A. Carolyn Kahn provided the opinion that Bijan Almassian was not the person that they would want in the management position seeking those milestones. The plaintiff merely makes a conclusory claim that because he has such a high opinion of himself and his qualifications, that if someone had an opposing opinion it must be due to some discriminatory basis. Plaintiff has not properly alleged such a violation and based upon the facts presented cannot demonstrate and prove that there was a violation of the same.

### B.    The Defendant Is Entitled To Summary Judgment Upon Plaintiff's Claim Of Tortious Interference With Business Expectations

A claim for tortious interference with contractual relations requires the plaintiff to establish 1) the existence of a contractual or beneficial relationship, 2) the defendant's knowledge of that relationship, 3) the defendant's intent to interfere with the relationship, 4) the interference was tortious and 5) a loss suffered by the plaintiff that was caused by the defendant's tortious conduct.

*Appleton v. Board of Education of the Town of Stonington, et al*, 254 Conn. 205, 212-213 (2000).

In order to survive a motion for summary judgment the plaintiff must allege and prove "an actual loss" resulting from the improper interference with the contract. *Id.* at 213. "The tort is not complete unless there has been actual damage suffered." *Id.* In the instant matter the plaintiff has not suffered an actual loss from any actions or statements of the defendant. Plaintiff seems to allege that he was forced to resign as a result of those comments. However, he has admitted that the founders of AlexiPharma and the people who initially hired him requested and asked him not to

resign from that employment. However, despite those requests not to resign the plaintiff claims that he still felt that he had to resign.

Along these lines it appears that the plaintiff is seeking to claim that constructive discharge will assist him in demonstrating that he has suffered an actual loss. However, constructive discharge of an employee only occurs when there is such an intolerable work atmosphere that the employee is forced to quit involuntarily. See, *O'Brien v. Stolt-Nielsen Transportation Group, Ltd., et al,* 48 Conn. Supp 200, 208 (2003). The test for constructive discharge involves more than the employee's subjective opinion. It is an objective standard. *Id.* Based upon the plaintiff's own admission his thought to resign was merely subjective and he has admitted that his employers requested that he not resign. This scenario is similar to the *Appleton v. Board of Education* standard where the individual resigned voluntarily and the court found that that resignation was insufficient to support a claim of tortious interference with contractual relations. *Appleton v. Board of Education,* 254 Conn. at 213-215.

Further, in order to prove the element of intent to interfere with the contractual relationship, the plaintiff must prove that the defendant's conduct was in fact tortious. *Richards v. O'Neil,* 2000 WL 640314 Connecticut Superior Court (April 24, 2000). This element can only be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation, molestation or that the defendant acted maliciously. *Id.* also citing *Dailey v. Aetna Life & Casualty Company,* 249 Conn.

766, 805-806 (1999). "The plaintiff in a tortious interference claim must demonstrate malice on the part of the defendant, not in the sense of ill will, but intentional interference without justification… in other words, the employee bears the burden of alleging and proving lack of justification on the part of the actor." *Id.* citing *Dailey v. Aetna Life & Casualty Company*, supra 249 Conn. at 805-806. The plaintiff has not and cannot demonstrate that said comments towards the plaintiff were tortious. It was merely an opinion of the business qualifications of the plaintiff. The plaintiff must do more than claim that it is his subjective thought that the statements were motivated by improper bias.

It is important to consider that not every act that disturbs a contract or business expectation is actionable. See, *Jones v. O'Connell*, 189 Conn. 648, 660-61 (1983). "A claim is made out only when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself." *Pediatric Occupational Therapy Services, Inc. v. The Town of Wilton, et al*, 2004 WL 886394, p. 5, Connecticut Superior Court, April 7, 2004. Also citing, *Downes-Patterson Corp. vs. First National Supermarkets*, 64 Conn. App. 417, 429 (2001).

The plaintiff in this has candidly admitted that it was his own subjective thought to resign his employment at AlexiPharma. He cannot demonstrate that his resignation was involuntarily in that he admits that the founders and his employers requested that he not resign from the company. The plaintiff's own admission goes against the claim that there was any interference with the

business expectation or contractual relationship between Bijan Almassian and AlexiPharma.

      **C.**      **Judgment Should Enter On The Plaintiff's Claim For Intentional Infliction Of Emotional Distress Due To The Fact That The Complaint Is Legally Insufficient In That The Facts Alleged In The Complaint Do Not Rise To The Required Level Of Extreme And Outrageous Conduct**

The conduct as known and admitted was not extreme and outrageous as a matter of law. The elements required to establish a claim of intentional infliction of emotional distress are well settled under Connecticut law. The plaintiff must establish:

> (1) that the actor intended to inflict emotional distress or that [the defendant] knew or should have known that emotional distress was a likely result of [the defendant's] conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.

*Appleton v. Board of Education of the Town of Southington*, 254 Conn. 205, 210 (2000). See also, *Huff v. West Haven Board of Education*, 10 F. Supp. 2d 117, 122 (D. Conn. 1998).

Whether a defendant's conduct is extreme and outrageous is initially a question of law for the court. See, *Appleton*, 254 Conn. App. 210. "Liability for intentional infliction of emotional distress requires conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause and does cause mental distress of a very serious kind …." *Muniz v. Kravis*, 59 Conn. App. 704, 708 (2000).

> Liability has been found only where the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in civilized community.

> Generally the case is one in which the restoration of facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim outrageous.

*Appleton*, 254 Conn. at 210-11. "Conduct on the part of the defendant that is merely insulting or displayed bad manner that resulted in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Appleton*, 254 Conn. at 211.

In the present action the plaintiff claims that the statements made by the plaintiff as to his business qualifications constitute extreme and outrageous conduct on the part of the defendant. However, a review of those statements merely indicates an opinion that the plaintiff does not have the business qualifications which the defendant believes are necessary in order for the company to proceed and attract further institutional investors. The plaintiff claims that he does have the business qualifications. However, he also admits that he joined AlexiPharma in order to receive mentoring in these exact areas from Mr. Harry Penner. Someone who seeks to receive additional mentoring obviously does not have all of the qualifications which they claim.

Further, the plaintiff candidly admits that he agrees that there are people who would have the opinion that he does not have the business qualifications which he claims to have. He is not surprised by the fact that there are people who have that negative opinion. However, he attempts to claim that the fact that Ms. Kahn has that same opinion is due to her claimed hatred for the Muslim religion. However, the plaintiff is unsure and only assumes that the defendant is Jewish and cannot

say for sure. He bases that assumption on the defendant's last name. As the defendant states she was unaware that the plaintiff was of the Muslim religion in that they never had any discussion about same. The discussions between the plaintiff and the defendant related to the application that AlexiPharma made to Connecticut Innovations, Inc. for funding.

The analysis made by the defendant and statements as to her business thoughts and qualifications of the plaintiff are nothing more than that – an analysis and an opinion. This is something that happens every day in the business field where people analyze a company based upon qualifications of the upper level management. To say that said comments, although they may result in hurt feelings, support a claim for intentional infliction of emotional distress is outrageous in itself. The plaintiff has no basis to claim that such opinions, which he candidly admits other people have, constitute intentional infliction of emotional distress because they were made by Carolyn Kahn. Connecticut has decided this issue numerous times and has found much more severe behavior to not support a claim for intentional infliction of emotional distress. For example, see, *DeLeon v. Little*, 981 F. Supp. 728 (D. Conn. 1997). (The court found that the employer's alleged conduct including orders to purchase illegal drugs, repeated telephone calls to the plaintiff at her home, treats to terminate her employment and replace her with an individual of another race, repeated degrading and humiliating criticism of the plaintiff in the presence of others did not rise to the level of extreme and outrageous behavior in order to support such a claim.); *Appleton v. Board*

*of Education*, 254 Conn. 205 (2000). (The court found subjecting the plaintiff to condescending comments in front of her colleagues, subjecting her to two psychiatric examinations, telling her daughter that the plaintiff was acting differently and should take a few days off from work, had the police escort the plaintiff out of the building and suspended her from employment forcing her to resign did not rise to the level of extreme and outrageous behavior.); *Lopez-Salerno v. Hartford Fire Insurance Company*, 1997 WL 766890 (D. Conn., Nevas, J.). (The plaintiff was terminated just as she would become eligible for long-term disability benefits which did not satisfy the requirements of extreme and outrageous behavior.); *Keene v. Hartford Hospital*, 208 F. Supp. 2d 238 (D. Conn. 2002) (plaintiff's allegations of racial and ethnic epithets, threats of physical violence by another employees, claims of a petition by other employees accusing the plaintiff of creating dissention and claims of retaliation were held not to be extreme and outrageous); and *Cheverier v. Connecticut General Life Insurance*, 3:00CV2292 (AVC)(D. Conn. November 9, 2001) (plaintiff's allegations of improper motive, abuse of power and the defendant's knowledge that the plaintiff was particularly susceptible to emotional distress was not extreme and outrageous behavior.)

The plaintiff has not alleged any behavior which is extreme and outrageous. The admissions of the plaintiff go against the fact that the conduct was extreme and outrageous behavior and he cannot support his conclusory claim that a business related opinion which other

people would have of the plaintiff was motivated by hatred of religion because it was made by the defendant.

        **D.**      **The Plaintiff's Claim For Negligent Inflction Of Emotional Distress Is Legally Insufficient And Also The Facts Do Not Warrant A Finding In Favor Of The Plaintiff On That Issue**

In order for the plaintiff to prevail on a claim for negligent inflction of emotional distress, the plaintiff must allege and prove that the defendant "knew or should have known that [her] conduct involved an unreasonable risk of causing emotional distress, and that the distress, if it were caused, might result in illness or bodily harm." _Johnson v. Cheseborough-Pond's Company USA_, 918 F. Supp., 543, 553 (D. Conn. 1996). The plaintiff must also plead extreme and outrageous conduct when claiming negligent inflction of emotional distress. See, _Javier v. Engelhard Corp., et al_, 2001 U.S. Dist. Lexis 17348, citing _Muniz v. Kravis_, 59 Conn. App. 704, 709 (2000). In _Javier_ the District Court further held that elements of the negligent inflction of emotional distress and intentional inflction of emotional distress differ as to the state of mind of the actor and not to the conduct claimed. _Id._ at 17, also citing _Johnson v. Cheseborough-Pond's Company USA_, 918 F. Supp, at 553. Due to the fact that the plaintiff relies on the same conduct to support his negligent inflction of emotional distress that he does for intentional inflction of emotional distress, this claim is likewise insufficient and does not rise to the level of extreme and outrageous behavior.

Further, the court should be reluctant to recognize the tort of negligent infliction of emotional distress so as to not "open a wide vista of litigation in the field of bad manners, where relatively minor annoyances had better be dealt with by instruments of social control other than the law." *Montinieri v. Southern New England Telephone Company*, 175 Conn. 337, 345 (1978). Further conduct which is occurring during an ongoing employment relationship cannot support a claim for negligent infliction of emotional distress. See, *Perodeau v. City of Hartford*, 259 Conn. 729, 762-73 (2002). The plaintiff claims that based upon comments by the defendant he was forced to resign despite the fact that the principals of his company asked him not to resign. Accordingly, these comments were made during his ongoing employment relationship and therefore cannot give rise to a claim for negligent infliction of emotional distress. It is believed that the reasoning and principles underlying the court's hesitation to extend the tort of negligent infliction of emotional distress in the employment context is relevant here despite the fact that the defendant was not the plaintiff's employer. The allegations stem around his employment and the fact that the statements caused him to be forced to resign. Accordingly, the analysis would be similar in the instant matter.

      E.      **The State Law Based Claims Are Barred By Connecticut General Statutes §4-165 And The Plaintiff Is Immune From Personal Liability**

Connecticut General Statutes §4-165 provides that "no state officer or employee shall personally liable for damage or injury, not wanton, reckless or malicious caused in the discharge of his duties or within the scope of his employment." It was the plaintiff's job and position to evaluate

all aspects of a company seeking funding from Connecticut Innovations, Inc. As part of that analysis the defendant was required to evaluate the business qualifications of the upper management team of the company seeking funding. Necessarily that evaluation would also result in conclusions, recommendations and opinions based upon the same. The defendant herein made her conclusions and opinions based upon that of an evaluation. Accordingly, the statements which essentially claim that the plaintiff did not have the business qualifications to lead the company further were made in the course and scope of her employment as part of an analysis she was required to perform. Accordingly, she is immune from these claims.

**V.     CONCLUSION:**

The court should also not entertain jurisdiction of the plaintiff's stated claims if summary judgment enters on the first count.

THE DEFENDANT


By:_____
        Kevin S. Coyne
        Coyne, von Kuhn, Brady & Fries, LLC
        999 Oronoque Lane
        Stratford, CT 06614
        Telephone - (203) 378-7100
        Fax – (203) 378-7711

#ct11937

**_CERTIFICATION_**

This is to certify that a copy of the foregoing has been sent, via U.S. mail, postage prepaid,

this 1st day of June, 2004, to:

John R. Williams, Esquire
51 Elm Street
New Haven, CT 06510

_____
Kevin S. Coyne
Coyne, von Kuhn, Brady & Fries, LLC
999 Oronoque Lane
Stratford, CT 06614
Telephone - (203) 378-7100
Fax – (203) 378-7711
#ct11937