UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
BIJAN ALMASSIAN, Ph.D.

    Plaintiffs

VS.                                                                          CIVIL ACTION NO.
                                                                                    3:03 CV 648 MRK

CAROLYN R. KAHN,

    Defendant                                                          JUNE 1, 2004
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ***LOCAL RULE 56 (A)1 STATEMENT***

**I.     STATEMENT OF FACTS:**

1. Carolyn Kahn is a resident of Woodbridge, Connecticut and at all relevant times to this action was the managing director for the Bioscience Fund at Connecticut Innovations. See, plaintiff's complaint, paragraph 2 and defendant's answer admitting same.

2. Connecticut Innovations, created by the Connecticut legislature in 1989, is charged with growing Connecticut's entrepreneurial, technology economy by making venture and other investments to start up companies headquartered in Connecticut. See, Connecticut General Statutes §32-33; see also, Exhibit A, Affidavit of Kahn.

3. Connecticut Innovations is a quasi-public agency of the State of Connecticut. See Connecticut General Statutes §1-120(1) and §1-79(l). Bioscience is a division of Connecticut

Innovations which focuses on medical and biology fields and investments in companies in said related business. See, Exhibit A, Affidavit of Kahn.

4. At all relevant times, AlexiPharma was a Delaware corporation licensed to do business in the State of Connecticut and had an address in Connecticut. See, Exhibit B, Deposition of Bijan Almassian, pp. 21-22.

5. At all relevant times AlexiPharma was a start up company in Connecticut seeking funding from Connecticut Innovations in 2002. See, Exhibit B, Deposition of Bijan Almassian, pp. 26-30.

6. Plaintiff was hired by AlexiPharma with the title president/chief operating officer with a start date of June 3, 2002. See, Exhibit B, Deposition of Bijan Almassian, pp. 30-31; see also, Exhibit C, accompanying exhibit marked at his deposition identifying said job offer.

7. The plaintiff was hired with a starting salary of $200,000 potentially increasing to $220,000 following the funding of a Series A investment which would be raising $10,000,000 in investments, a bonus plan of 20 to 25% dependent on achievement of milestones, stock shares amounting to approximately 5.6%, but subject to dilution upon the Series A investment. See, Exhibit C.

8. The plaintiff claims that in his position at AlexiPharma he could possibly become CEO. However, his offer indicates that if the company and venture capitalists see him as a CEO he will earn that title at the Series A funding closing. However, the company will seek a CEO if things do

not work out, but the plaintiff may stay on as the chief operating officer. See, Exhibit C.

9. The plaintiff's salary increase and bonus was contingent upon achieving milestones of raising $10,000,000, increasing employment to 30 employees and performing incubation at the University of Connecticut. See, Exhibit C.

10. AlexiPharma is currently not operational in Connecticut or any other state. See, Exhibit B, Deposition of Bijan Almassian, pp. 32-33.

11. Bijan Almassian's employment prior to AlexiPharma was with Vion Pharmaceuticals out of New Haven, Connecticut, as vice president of drug and corporate development. See, Exhibit B, Deposition of Bijan Almassian, pp. 16-19.

12. Plaintiff was actually looking for employment in 2001 and 2002 and received an offer of employment from Panacea Pharmaceuticals of Maryland prior to his offer from AlexiPharma. The Panacea Pharmaceuticals offer was for Mr. Almassian to become the chief operating officer with a salary of $200,000, stock options and a bonus plan. See, Exhibit B, Deposition of Bijan Almassian, pp. 54-58, 78-79.

13. The plaintiff accepted the offer from AlexiPharma in that he thought it would provide him with more opportunity to learn from the entrepreneurial/business founder, Harry Penner, and become a chief operating officer of a company. See, Exhibit B, Deposition of Bijan Almassian, pp. 24, 79.

14. The plaintiff admits that prior to joining AlexiPharma he lacked entrepreneurial

experience and negotiation skills as a CEO and looked to Harry Penner, founder of AlexiPharma, as a mentor in those two areas. See, Exhibit B, Deposition of Bijan Almassian, pp. 24, 79.

15. Bijan Almassian was involved and assisted AlexiPharma in its request for funding made to Connecticut Innovations in 2002. See, Exhibit B, Deposition of Bijan Almassian, p. 30.

16. In June, 2002 AlexiPharma applied for funding from Connecticut Innovations with a Bioseed Fund application. See, Exhibit A, Affidavit of Kahn.

17. AlexiPharma by Bijan Almassian made a presentation to Connecticut Innovations in July, 2002. See, Exhibit A, Affidavit of Kahn.

18. Carolyn Kahn, as well as others on her team, analyzed the application from AlexiPharma the same way they did for any other company seeking funding through Connecticut Innovations. See, Exhibit A, Affidavit of Kahn.

19. Carolyn Kahn's analysis relates to all aspects of any company seeking funding, including but not limited to, qualifications of upper management as to experience and ability to manage and control a corporation, keep same on the correct path and attract new investors. See, Exhibit A, Affidavit of Kahn.

20. It is the opinion of Carolyn Kahn as well as any sound investment individual that the key aspect of top management is the ability to attract additional investors. See, Exhibit A, Affidavit of Kahn.

21. This is important to Connecticut Innovations as well as other investors in that it would

assist in protecting the investors as well as Connecticut Innovations' investment into a new start up company. See, Exhibit A, Affidavit of Kahn.

22. Connecticut Innovations also worked with other venture capitalists and companies to introduce them to AlexiPharma to foster outside investment. See, Exhibit A, Affidavit of Kahn; see also, Exhibit B, Deposition of Bijan Almassian, pp. 45-47.

23. Outside investors as well as the Connecticut Innovations investment team had doubts about Bijan Almassian's ability to be an effective CEO, to attract additional investors, properly direct the scientific findings of Alex Makriyannis and manage the patents that Mr. Makriyannis had with the company in an efficient and prosperous manner. See, Exhibit A, Affidavit of Kahn.

24. This doubt arose following Mr. Almassian's presentation to Connecticut Innovations and other investors in July, 2002 in that Mr. Almassian, in the opinion of Connecticut Innovations as well as other investors, did not make a dynamic presentation. See, Exhibit A, Affidavit of Kahn.

25. Carolyn Kahn did not have ultimate authority as to which company seeking funding from Connecticut Innovations would obtain the funding. However, her role was to analyze the company with a focus on both the business and science end of the company and provide her analysis and recommendations to the investment committee at Connecticut Innovations. See, Exhibit A, Affidavit of Kahn.

26. Carolyn Kahn informed Harry Penner of the concerns that she, the Connecticut Innovations investment team and others had about Mr. Almassian's business qualifications in late

and fall and early December, 2002. See, Exhibit A, Affidavit of Kahn; see also, Exhibit D.

27. Carolyn Kahn's opinion was that Bijan Almassian was well qualified on the science side of the business and could be beneficial to the company in development, but would not be beneficial to the company as the chief executive officer. See, Exhibit A, Affidavit of Kahn.

28. Following the July, 2002 presentation to Connecticut Innovations, Carolyn Kahn provided a summary to the Bioseed Advisory Committee stating that the weaknesses of AlexiPharma related to strategy capabilities and experience on the business end. See, Exhibit A, Affidavit of Kahn.

29. Funding was not immediately approved in July or August, 2002. See, Exhibit A, Affidavit of Kahn.

30. AlexiPharma continued to request and seek funding by making changes at the director level, top management level which included Harry Penner being the chief executive officer and Bijan Almassian working on the development side. See, Exhibit A, Affidavit of Kahn.

31. Carolyn Kahn provided an update on AlexiPharma to the Bioseed Advisory Committee members on December 23, 2002. The updates related to a Mr. Davis Temple joining the board of directors of AlexiPharma; a Richard Carter becoming head of research; Harry Penner was to become the CEO; and Bijan Almassian would focus on operations and development. See, Exhibit A, Affidavit of Kahn.

32. Connecticut Innovations provided a proposal for funding following the updates in

December, 2002. In the proposal for funding it indicated that they would offer $500,000 as investment capital to AlexiPharma with certain conditions. It is important to note that the $500,000 offer was the upper limit sought by Connecticut Innovations. See, Exhibit A, Affidavit of Kahn; see also, Exhibit B, Deposition of Bijan Almassian, pp. 45-47.

33. AlexiPharma refused the funding proposed by Connecticut Innovations. See, Exhibit B, Deposition of Bijan Almassian, p. 45.

34. Bijan Almassian found out from Harry Penner that Carolyn Kahn questioned his business qualifications and the general opinion was that Bijan Almassian was not the correct person to be in the chief executive officer position of AlexiPharma. See, Exhibit B, Deposition of Bijan Almassian, pp. 38, 50-51, 60-62.

35. Bijan Almassian left AlexiPharma in January, 2003. See, Exhibit B, Deposition of Bijan Almassin, p. 54.

36. Bijan Almassian claims that he was forced to resign because Carolyn Kahn would not approve funding with him in management. See, complaint.

37. Alex Makriyannis, the scientific founder of AlexiPharma, and Harry Penner, business founder, investor as well as CEO, told Bijan Almassian to stay and that funding would be forthcoming. Both individuals requested that he not resign his employment with AlexiPharma. See, Exhibit B, Deposition of Bijan Almassian, pp. 70-71.

38. Bijan Almassian's job at Panacea is that of chief operating officer with $200,000 in

salary, bonus and stock plan. The job also includes that the company will pay for a house that he stays in while he is working in Maryland. This offer and position with benefits in January, 2003 was similar to the offer made in May, 2002. See, Exhibit B, Deposition of Bijan Almassian, pp. 57-58, 78; see also, Exhibit E, the agreement between Bijan Almassian and Panacea Pharmaceutical.

      39.  Bijan Almassian admits that his business style is different than what Carolyn Kahn believes to be the correct business style for a CEO at AlexiPharma. See, Exhibit B, Deposition of Bijan Almassian, pp. 60-63.

      40.  Carolyn Kahn never made a statement to the plaintiff about the Muslim or Jewish religions. See, Exhibit B, Deposition of Bijan Almassian, pp. 35-36.

      41.  Bijan Almassian assumes that Carolyn Kahn was Jewish due to her surname, but has no way to confirm Carolyn Kahn's religion. See, Exhibit B, Deposition of Bijan Almassian, p. 48.

      42.  Carolyn Kahn is of the general opinion that the CEO of AlexiPharma should be an individual that needs a more direct approach with a scientific founder and as someone who would be able to control that founder. Mr. Almassian admits that said direct approach was not his style. See, Exhibit B, Deposition of Bijan Almassian, pp. 60-61.

      43.  Bijan Almassian was looking to leave Vion Pharmaceutical, his prior employment, for approximately one year prior to June, 2002. See Exhibit B, Deposition of Bijan Almassian, p.

79.

44.     Bijan Almassian has admitted that he is not surprised that people would have the opinion that he lacks business qualifications. See, Exhibit B, Deposition of Bijan Almassian, pp. 86-87.

45.     Bijan Almassian has not taken any medication, received any counseling or medical assistance or help regarding psychiatric problems, depression or anxiety. See, Exhibit B, Deposition of Bijan Almassian, p. 83.

THE DEFENDANT

By:_____
Kevin S. Coyne
Coyne, von Kuhn, Brady & Fries, LLC
999 Oronoque Lane
Stratford, CT 06614
Telephone - (203) 378-7100
Fax – (203) 378-7711
#ct11937

## *CERTIFICATION*

  This is to certify that a copy of the foregoing has been sent, via U.S. mail, postage prepaid, this 1st day of June, 2004, to:

John R. Williams, Esquire
51 Elm Street
New Haven, CT 06510

                      _____
                      Kevin S. Coyne
                      Coyne, von Kuhn, Brady & Fries, LLC
                      999 Oronoque Lane
                      Stratford, CT 06614
                      Telephone - (203) 378-7100
                      Fax – (203) 378-7711
                      #ct11937